Filed 8/19/21; Certified for Publication 9/9/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090014 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE014027) |
| v. | |
| AMIT BHARTH, | |
| Defendant and Appellant. | |

A jury found defendant Amit Bharth guilty of two counts of forcible rape (Pen Code, § 261, subd. (a)(2)),[1] assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), and false imprisonment (§ 236). The jury also found true the allegation that defendant personally inflicted great bodily injury. (§ 12022.7, subd. (a).)

---

[1] Further undesignated statutory references are to the Penal Code.

1

The trial court sentenced him to 23 years eight months in prison. This timely appeal followed.

The sole issue on appeal is whether the trial court erred in denying defendant's motion for mistrial, which was based on his contention that the court permitted testimony by the victim that violated his confrontation clause rights. We see no error and affirm.

**BACKGROUND**

*Evidence from Trial*

In view of the limited issue raised on appeal, we briefly summarize the relevant facts underlying defendant's convictions, construing them in the light most favorable to the judgment. (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

In late January 2017, the victim was 24 years old and staying at a friend's house in Sacramento. One evening she approached a man, later identified as defendant, in a parking lot and asked to use his cell phone. He forced her into his sport utility vehicle (SUV) and drove away. Over the next seven days, they slept in motels or his SUV.

Defendant twice raped the victim in a motel room. During the week he was with her, he would not let her leave, and beat her, including slapping the back of her head hard and punching her in the face, shoulders, legs, and arms. He hit her with a propane tank, pulled out chunks of her hair, banged her head against parts of the SUV, and attempted to burn her with a blowtorch. She eventually escaped from the SUV and ran to a nearby business. An employee of that business called 911; it was the evening of February 2, 2017.

When officers arrived at the scene, the victim was crying and scared. She had serious injuries to her face and back and was taken to the hospital by ambulance. At the hospital, she was crying and restless. She could only partially open her mouth and complained that any movement of her body was painful. Her clothes were ripped and bloody and she was missing large patches of hair on the back of her head. She reported that defendant had forcibly raped her and forced her to orally copulate him. Medical

2

personnel observed severe bruising and swelling on her face as well as numerous bruises and abrasions all over her body. She was unable to open her left eye and her right eye was hemorrhaging. She had nasal bone fractures and a concussion, and her vaginal area was red.

On March 2, 2017, the victim identified defendant as the perpetrator from a photographic lineup. DNA analysis revealed that defendant's profile matched the sperm profile on the swabs taken from the victim.

Defendant testified on his own behalf at trial. He claimed that he met the victim in the parking lot the evening of January 24, 2017. He allowed her to use his cell phone and then agreed to give her a ride. Thereafter, they hung out together for a week and had consensual sexual intercourse several times. Over the course of the week, they went to various places, including casinos, stores, movies, restaurants, parks, and a fitness center. The last time defendant saw the victim was the evening of January 31, 2017, when he dropped her off at a Burger King so she could meet up with her grandma.

Defendant denied raping the victim, threatening her, or hitting her. He denied that he forced her into his SUV, or that he forced her to orally copulate him. He did admit that he repeatedly lied to the police when he claimed he did not have sex with her.

*The Victim's Manner of Testifying on Direct Examination*

The victim was 26 years old when she testified at trial. She was dyslexic and had bipolar disorder. She also claimed that she had been "diagnosed with . . . mild mental retardation, as well as other cognitive disorders and delays." At the outset of her testimony, she said she was nervous. The trial court then instructed her to move the microphone closer to her and to speak into it as loud as she could. When she was asked to explain how she was doing, she said that she was feeling "frantic" and nervous to talk about "the things that happened" to her. Shortly thereafter, the prosecutor asked the trial court if the jurors should raise their hands if they were having difficulty hearing the

3

victim. In response, the court instructed the jury, "Just get our attention, if you have any difficulty hearing at any time."

When the prosecutor began asking about the initial encounter with defendant, the victim said that she was feeling nervous and scared and was experiencing a "flashback." She said she would recognize the man she encountered if she saw him, but indicated he was not in the courtroom. She explained that she was afraid to describe the man in detail because "something might happen" if she did. After a break, the victim testified she was very angry and defendant's facial expressions were "mean," which was "bring[ing] a lot of flashbacks."[2] She explained that it made her feel "disgusted to know that he did what he did," and that she had to relive the trauma because of him. She also noted that it disgusted her to think about what had happened. She then identified defendant as the perpetrator, explaining that he was the man with the SUV.

Under continued questioning, the victim said that she got into defendant's SUV, "not by [her]self," after she asked to use his cell phone to call a friend. At that point, defense counsel interjected, stating that he wanted to note for the record that the victim had her head down and was not speaking into the microphone. He was able to follow along with her testimony because he was receiving a real-time transcription from the court reporter on his iPad, but was unsure if the jury was able to hear her. In response, the trial court stated, "Can everybody hear okay? Just let us[] know if you can't hear the testimony." No juror responded.

Thereafter, the prosecutor questioned the victim about the events that occurred after she was inside defendant's SUV. During this exchange, the prosecutor asked her to keep her chin up on four separate occasions because it was hard to hear her when her head was down. Following the fourth request, the victim testified that defendant raped her two times in a motel room, and that it was really hard for her to talk about those

---

[2] On cross-examination, she explained that she had bipolar disorder, which caused her to have "really bad anger issue[s]." She took medication for it.

4

incidents. When the trial court asked her if she needed a break, she said, "It's hard." In response, the court stopped the trial, noting that it was a few minutes before the lunch recess.

When the trial resumed, the victim explained that she was feeling "[k]ind of frantic," "kind of shaky." The prosecutor moved the microphone closer to her and told her to do her best to speak into it. Under continued questioning about the rapes, the prosecutor noted several times that he was having trouble hearing the victim and that her head was down. He asked her to look up and to move her hair away from her face so everyone could see her. At one point, she said, "I can't talk about this." Shortly thereafter, she said, "I just can't talk about it anymore," explaining that it was "too painful." But she continued to answer questions about the rapes, as the prosecutor asked her to look up and speak up several times. After describing additional details of the physical abuse, the victim stated that she needed a break, explaining that the questioning was "too much for [her]."

Following the break, the prosecutor told the victim that she could turn her chair in the direction she was facing, as long as she kept her voice up so everyone could hear her. At that point, defense counsel objected, stating, "I can't see the witness. I can't see her face. She's turned to the side. All I can see is a head of hair." The trial court stated, "For the record, she's in the witness stand. She's turned to the left facing the wall to the left and facing the jury. She's not looking at counsel." The prosecutor added, "She's also not looking at the defendant"; the court agreed.

Thereafter, the victim testified about defendant's physical abuse, including multiple punches, and explained that he engaged the child locks in his SUV to prevent her from escaping. During this exchange, the prosecutor told the victim to look up and to move her hair so everyone could see her. He also asked her to speak into the microphone several times because he was having a hard time hearing her. She explained that defendant had done hurtful things to her, and that she was upset because the "trauma and

5

the memories [were] hard for [her]." She noted that she had nightmares, was terrified to go anywhere by herself, and was having a difficult time trusting anybody because of what he did to her.

After the prosecutor reminded her to keep her chin up and to look at him, she explained how she escaped from defendant. During this exchange, the prosecutor, again, reminded her to keep her chin up. Under continued questioning, she described how she felt when the police officers arrived, what she remembered about the events at the hospital, how her body felt, and how long it took her to feel better. When she was asked about her current mental state, she explained that she was trying to move on with her life; trying to heal and forget about what had happened, but it was very hard because the "[t]rauma and the memories will never go away." She explained that defendant told her he would say "[she] asked for it" if she reported what he had done. After the prosecutor reminded her to look up, he asked whether defendant had said anything else about what he would do to her. She replied, "[H]e would have somebody hurt me." The prosecutor asked her to lift her chin and repeat why defendant's remarks made her angry. In response, she said, "If I told anyone, he said [he] would . . . tell them that it was my fault and that I asked for it and that made me pissed off."

*Continuance and Motion for Mistrial*

At the conclusion of direct examination, counsel and the trial court engaged in a discussion outside the presence of the jury. The court stated: "[M]y understanding is [that] it's been a long day for the complaining witness testifying today. There's been a lot of pauses in her testimony due to her gathering herself emotionally, and my understanding is she's . . . asking if we can recess for the day and commence with her cross-examination in the morning so that she could be rested and refreshed." Defense counsel voiced no objection to proceeding in this manner.

The next morning, the prosecutor moved for a continuance, explaining that the victim had been up all night having an anxiety attack and did not have her prescription

6

medication, which she had not taken for two days. The prosecutor explained that the victim had experienced an anxiety attack during direct examination, and that she was in bed sobbing and was "catatonic."

After the trial court granted a one-day continuance, defense counsel stated that he intended to file a motion for mistrial because defendant's confrontation clause rights had been violated during the victim's direct examination. He argued that the victim "was hidden to the point that the jury could not see her," as she turned her body while testifying, her hair was covering the side of her face, and she looked down and spoke very softly. Defense counsel noted that it was "almost impossible" to hear her testimony, and he wondered how the jury was able to hear her, although he acknowledged that he was able to follow along with her testimony because he was receiving a real-time transcription. Counsel stated: "We saw [her] face maybe once or twice. But the majority of her testimony consisted of her looking to the side . . . ." The next day, defense counsel filed a written motion for new trial, making similar arguments and insisting that defendant's confrontation clause rights had been violated because the jury was unable to observe the victim's demeanor.

*Additional Examination*

After the parties agreed that the hearing on defendant's motion for mistrial could take place after the victim finished her testimony, defense counsel noted that the victim's hair was now in a ponytail and that he was going to ask her to look at him (but not defendant) while she testified on cross-examination. In response, the trial court stated: "For the record, you are intending on standing at the podium . . . at the end of the jury box which is about 10 feet away from [defendant]. It's looking in the same direction in the courtroom but looking at an angle away from the defendant . . . ."

Prior to the commencement of cross-examination, the trial court granted the prosecutor's request to reopen direct examination. During her exchange with the prosecutor, he told her to keep her voice up several times, to keep her chin up, to speak

7

into the microphone, and to move her hand away from her face several times. When she was asked about the physical abuse, she indicated multiple times that it was difficult for her to talk about it.

After a break in the proceedings, defense counsel began his cross-examination. At the outset, counsel asked the victim to face him, and the trial court instructed her to look at him. When asked, she agreed to keep her voice up and to use the microphone. Shortly thereafter, defense counsel requested a break after indicating that he was having trouble hearing her. Following the break, the trial court instructed her sit up and speak into the microphone.

When defense counsel began questioning the victim about the events that occurred after she got into defendant's SUV, defense counsel noted "for the record that [the victim] is facing the back wall and all we can see is the back of her head. I've requested several times that she go over to the microphone but she's not doing it." In response, the trial court stated: "For the last couple questions that's accurate." The court instructed the victim to "spin a little bit" and talk into the microphone as she had done earlier. Shortly thereafter, she said she needed a break.

Following the break, defense counsel continued to ask the victim about the events that occurred after she got into defendant's SUV, including questions about the motels they stayed at, what they did during the week they spent together, whether she attempted to ask people for help, whether she attempted to escape, and why she was unable to escape earlier. During this lengthy exchange, the victim asked for a tissue after explaining that defendant had "molested" her twice in a motel room. She also indicated numerous times that it was very hard for her to talk about what had happened, that she was having difficulty remembering the details because defendant had "beat" her head, and that defendant made it "impossible" for her to escape, explaining that he made her lie on her back in the backseat of his SUV and he would hit her every time she got up. She also explained that she was overwhelmed and that it hurt to testify. At no point during

8

this exchange (which ended when it was time to recess for lunch) was there any indication that the victim was turned, or her head was down, or the jury was having a difficult time hearing her.

After the break, defense counsel continued to question the victim about what occurred during the time period she spent with defendant (including the rapes), also without any indication of difficulty seeing or hearing her or any objection.

*Trial Court's Ruling*

A hearing on defendant's motion for mistrial was held the following morning. Defense counsel argued the motion should be granted because the jury did not have an adequate opportunity to observe the victim's demeanor (including her facial expressions) and assess her credibility on direct examination. Counsel explained that the victim did not face the jury, defendant, or counsel table, her voice was extremely low, she did not speak into the microphone, she was bent over at times, and her hair covered the side of her face that was visible to counsel and the jury (i.e., the right side). Defense counsel acknowledged that the victim's hair was not covering her face during cross-examination, but noted that she took the "same posture" such that "we" could only see a side view of her face, although he conceded that the jury might have been able to see the front of her face. Counsel also noted that there were times when the victim turned around and looked at the back of the courtroom, but fewer than during direct examination. Counsel asserted that the victim only faced the jury one or two times, and that he had concerns as to whether the jurors heard her testimony, although he acknowledged that no jurors indicated difficulty.

The prosecutor argued that the motion for mistrial should be denied because the jury was able to view the victim and assess her demeanor. In support of his position, the prosecutor noted that no juror indicated having any difficulty hearing her testimony, her body was positioned toward the jury box when she rotated in her chair, and, contrary to defense counsel's assertion, she looked up and faced the jury more than once or twice

during direct examination. He argued the jury had the best opportunity to view the victim, as she spent the majority of her testimony facing toward the jury such that the front and right side of her face were visible to jurors, even when she was "hunched over." However, he acknowledged her voice was often low or "garbled in some way," and that her hair was covering the sides of her face during direct examination.

Before turning to the merits of the motion, the trial court described the layout of the courtroom, explaining that the jury box was to the left of the witness stand and elevated such that the jurors in the top row were sitting at the same height as the witness stand whereas the jurors in the front row were sitting slightly lower than the witness stand. The prosecutor added that the front of the jury box (i.e., the portion closest to the witness stand) was about four to five feet away from the witness stand.

In denying defendant's motion for mistrial, the trial court provided a detailed explanation of the victim's reluctance to testify and her difficulties, which we have already recited *ante*. The court's observations included that the victim "did testify that she was nervous. She was frantic. . . . [¶] The witness was crying throughout her testimony. There were very long pauses between the questions and answers. . . . And I don't think counsel would disagree there were a lot of times where the pause was pushing a minute or maybe more than a minute."

After making additional observations about the victim's conduct that are consistent with those evidenced by the record that we have already set forth, the trial court continued: "As far as my findings, this witness of course is not a child witness like the witnesses were [in the cases cited by the defense:] *Coy* [*v. Iowa* (1988) 487 U.S. 1012 (*Coy*)] and *Maryland* versus [ [*Craig* (1990) 497 U.S. 836 (*Craig*)] and [*People v.*] *Sharp* [(1994) 29 Cal.App.4th 1772 (*Sharp*)] and [*People v.*] *Gonzales* [(2012) 54 Cal.4th 1234 (*Gonzales*)]. She is an adult woman.

"At the time of the direct exam, . . . there was no evidence in the record of her mental deficiencies or issues she may have been suffering from. However, from the

offers of proof that were made in limine regarding her competency issues, the court is aware that she may have some undiagnosed and unquantified issues and then later in cross-examination, she testified a little bit to that."

At that point, the prosecutor interjected to note that the victim had mentioned on direct examination that she had dyslexia. The trial court agreed and then continued:

"However, even putting that aside, it's abundantly clear that this witness was suffering trauma as she testified. She alleged she was raped, beaten, and the person who did it was the defendant sitting in the room.

"So it's clear to the court that this witness could barely get through these proceedings. She could not look up. She could not look at the defendant. She did not even want to look up and around the courtroom. She's nervous; frantic; scared; afraid. According to her, she has to relive this trauma because of the defendant.

"So in order to get her testimony out, the court did allow her to turn the chair and did allow her to stay in that position over [defense counsel's] objection that he couldn't see her in order to just be able to get her testimony out, and get her in a position where she would at least talk and answer questions.

"I do find, for the record, that she would have been traumatized even more if she were made to face the defendant. I know that's not the argument, . . . but I'm considering that in the level of trauma that she was going through and distress that she was in.

"As the court discussed in *Craig* in the context of a child, there is a risk of damage to the witness here as well and to the truth-seeking process. And I'm tasked with determining how to afford the Defendant . . . the full measure of procedural protections to which he's entitled to under the confrontation clause without unduly undermining the witness whose testimony is [vital] . . . to this truth-seeking process[;] so that's the balance that the court has [to consider].

"Here as indicated, the jury never said that they couldn't hear the witness. And while she was not facing towards the defendant and she was not facing defense counsel,

11

she was facing towards the back wall that is behind the jury. She [was] facing towards the jury with her head down and her hair in and around her face. So the jury's view of her, while obscured at times, is still a better view than counsel had.

"The court reporter is transcribing the proceedings, and . . . we made sure everything was taken down. When the court reporter indicated she couldn't hear the witness, the answers were repeated.

"And, as [the prosecutor] points out, the jury can get read back too. So the substance of her testimony, if not heard at certain points during the trial, the jury can get that in the form of readback of the transcript. And then the manner of her delivery, how she spoke, softly, mumbling, the pauses, the emotions, the turning away, they get the manner of the deliver[y] of the substance of her testimony as well.

"So the central concerns of the confrontation clause I'm finding are met. Her physical presence, she was under oath subject to cross-exam, and the observations of her demeanor by the trier of fact. And that's really what this comes down to is what is the definition of observations of her demeanor."

The trial court went on to explain that: "the only real limitation on . . . defendant's right to confront the witness [was] that he did not have a full-frontal view of her face and it's possible the jurors did not have a full-frontal view of her face at certain times." After discussing the circumstances presented in *Sharp*, the trial court acknowledged that *Sharp* was a "little different" from this case in that the victim was turned toward the jury with her head down and her hair was obstructing portions of her face at times. The court added: "We all don't know exactly what view that the jury had of [the victim's] face and her facial expressions. From my point of view looking at her testimony, it appears that they would see part of her face at times."

The trial court continued: "Her hair was not so thick that it was always covering her face to where it was like a shield or a mask. She had thick hair that was in and around the side of her face. When you look at her from the side, you could not see her

12

face.  But from my view of her, it was not blocking the front of her face. . . .  [At] times her hair was in her face.

"She did tip back, she looked at the ceiling at times, and when she was just trying to get through it, she wasn't in the same position all the time.  I find that the jury did have enough of a view of her in order to judge her demeanor.

"Even if the defendant could not clearly see all of her facial expressions, everyone in the courtroom could see her general demeanor and her reactions to the questioning.

"So for all of these reasons, I think the jury did see enough in order to judge her demeanor that it's not a violation of [the] confrontation clause.

"CALCRIM [No.] 226 even phrases it as her behavior while testifying, and [the] jury] clearly saw her behavior and how she reacted to the questions.

"So for all these reasons, the Defense's motion for a mistrial, based on the violation of the confrontation clause during [the] direct exam of the alleged victim, is denied."

## DISCUSSION

Defendant contends reversal is required because the trial court permitted the victim to testify on direct examination in a manner that violated his confrontation clause rights under the state and federal constitutions.  As we explain, we disagree.

A trial court is vested with considerable discretion in ruling on a motion for mistrial.  (*People v. Harris* (2013) 57 Cal.4th 804, 848.)  A mistrial should be granted when a defendant's chances of receiving a fair trial have been irreparably damaged.  (*Ibid.*)  "We review de novo a claim under the Confrontation Clause that involves mixed questions of law and fact.  [Citation.]  Under this standard, we defer to the trial court's determination of 'the historical facts' . . . but not the court's 'application of [the] objective, constitutionally based legal test to [those] historical facts.' " (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964.)

13

The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." It " 'provides two types of protections for a criminal defendant: The right physically to face those who testify against him, and the right to conduct cross-examination.' " (*Coy*, *supra*, 487 U.S. at p. 1017.)

The right to a face-to-face meeting between accused and accuser follows from the confrontation clause's "primary object": " 'to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " (*Craig*, *supra*, 497 U.S. at p. 845.) The central concern of the confrontation clause "is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Ibid*.) This concern is satisfied when the witness: (1) is physically present for his or her testimony; (2) testifies under oath; (3) is subject to cross-examination; and (4) may have his or her demeanor observed by the trier of fact. (*Id*. at pp. 845-846; see *Delaware v. Fensterer* (1985) 474 U.S. 15, 22 ["[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony"]; *Ohio v. Roberts* (1980) 448 U.S. 56, 69 [oath, cross-examination, and demeanor provide "all that the Sixth Amendment demands: 'substantial compliance with the purposes behind the confrontation requirement' "].)

14

In *Coy*, the United States Supreme Court held that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." (*Coy, supra*, 487 U.S. at p. 1016.) In the trial court, the state had successfully moved for a screen to be placed between the witness stand and the defendant, pursuant to a state statute that permitted children to testify behind a screen. (*Id*. at p. 1014 & fn. 1.) The high court held that placing a screen between the complaining witnesses and the defendant violated his right to face-to-face confrontation. (*Id*. at p. 1020.) With the screen in place and the courtroom lighting adjusted, the defendant could "dimly . . . perceive the witnesses" while they testified, but they could not see him "at all." (*Id*. at p. 1015.) The *Coy* court left for another day the question of whether any exceptions to the right exist, observing only that something more than the generalized presumption of trauma underlying the Iowa statute would be required. (*Id*. at p. 1021.) Nonetheless, the court clarified that the right to face-to-face confrontation does not require eye contact: "The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus the right to face-to-face confrontation serves much the same purpose as a less explicit component of the Confrontation Clause that we have had more frequent occasion to discuss the right to cross-examine the accuser; both 'ensur[e] the integrity of the factfinding process.' " (*Id*. at pp. 1019-1020.) It is true that this "face-to-face presence may . . . upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs." (*Id*. at p. 1020.)

Two years later in *Craig*, the United States Supreme Court recognized an exception to face-to-face confrontation in child abuse cases, upholding a Maryland statute that permitted a child victim to testify via a one-way closed circuit television, so long as the trial court makes a case-specific finding that the child would be traumatized by testifying in the defendant's presence, and the child's testimony is subject to rigorous

15

adversarial testing through cross-examination. (*Craig*, *supra*, 497 U.S at pp. 855-857; see also *id*. at p. 850 ["our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured"].) In upholding the statute, the high court stated: "[W]e conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause." (*Id.* at p. 857.)

In *Sharp*, the First Appellate District, Division Two, described how the right to face-to-face confrontation may be satisfied where the witness does not make eye contact with the defendant but testifies in open court without any physical barrier or screen obstructing the defendant or jury from viewing the witness.[3] In that case, the prosecutor remained next to the witness stand so the child witness could look away from the defense table while she was testifying. (*Sharp, supra*, 29 Cal.App.4th at p. 1780.) The defendant could see the side and back of the witness's head while she testified; even if he could not clearly see all of her facial expressions, he could see her general demeanor and reactions

_____

[3] We note that *Sharp* was disapproved by *People v. Martinez* (1995) 11 Cal.4th 434, 452 on another issue.

16

to questioning. The witness could, but chose not to, see the defendant and the jury could see both the witness and the defendant. (*Id*. at pp. 1781-1782) The *Sharp* court found the situation "not materially different from one in which a witness might stare at the floor, or turn her head away from the defendant while testifying" (*id*. at p. 1782), and it "resulted in only the most minimal interference with [the defendant's] right to confront his accuser" (*id*. at p. 1783). In concluding that the procedure approved by the trial court did not violate the confrontation clause, the *Sharp* court reasoned that the child witness physically appeared in open court to give live testimony against the defendant before judge and jury, the witness testified under oath and was subject to contemporaneous cross-examination, no physical barrier or screen was erected between the defendant and the witness as she testified, and no technological devices were employed to insulate the witness from the accused. (*Id*. at p. 1783.) The court noted that "the only limitation on the defendant's right to confront [the witness] was that he did not have a full, frontal view of her face," (*ibid*.), and that the "mere fact that the prosecutor facilitated [the witness's] decision to look away from [the defendant] does not transform this innocuous act into a violation of the confrontation clause." (*Id*. at p. 1782.)

In rejecting the defendant's claim that his confrontation clause rights were violated, the *Sharp* court stated: "Surely, [the defendant] cannot be claiming a constitutional right to stare down or otherwise subtly intimidate a young child who would dare to testify against him. Nor can he claim a right to a particular seating arrangement in the courtroom. A witness who avoids the gaze of the defendant may be exhibiting fear, embarrassment, shyness, nervousness, indifference, mendacity, evasiveness, or a variety of other emotional states or character traits, some or all of which might bear on the witness's credibility. [¶] It is, however, the function of the jury to assess such demeanor evidence and 'draw its own conclusions' about the credibility of the witness and her testimony. [Citation.] There was no interference with the jury's ability to perform that function in this case." (*Sharp*, *supra*, 29 Cal.App.4th at p. 1782.) The trial court did not

17

make explicit findings to support the seating arrangement, but the appellate court found it was apparent from the record of the victim's testimony prior to the institution of the arrangement that she "was experiencing considerable distress and suffering inexplicable memory lapses about sex acts she had theretofore consistently reported." (*Id*. at p. 1783.) "She was, in short, unable to participate effectively in the proceedings when seated in the conventional position in the witness box, facing appellant." (*Ibid*.)

Our Supreme Court relied on *Sharp* in reaching a similar conclusion in *Gonzales*. That case involved the murder by torture of a four-year-old girl by her uncle, the defendant, with whom she was living. (*Gonzales, supra*, 54 Cal.4th at pp. 1242-1243.) The People were allowed to admit the videotaped preliminary hearing testimony of the defendant's eight-year-old son at trial after the trial court found that the trauma he would suffer from testifying rendered him unavailable. (*Id*. at pp. 1247, 1261.) At the preliminary hearing, the child was allowed to sit at an angle, not directly facing the defendants. (*Id*. at p. 1265.) The podium was placed "so that the lawyers had eye contact with the witnesses during questioning, and the witnesses were free to look around the courtroom and make eye contact with [the] defendants, if they desired." (*Ibid*.)

Our Supreme Court found that this arrangement did not violate the defendant's right to face-to-face confrontation. (*Gonzales, supra*, 54 Cal.4th at pp. 1267-1268.) In rejecting the argument that the trial court failed to make the case-specific factual finding of necessity as required under *Craig*, the court quoted from *Sharp*, which involved the same seating arrangement as in *Gonzales*. (*Gonzales*, at p. 1267.) The high court also observed that "while the preliminary hearing court made no factual findings on the need to shield [the child] from [the] defendant's gaze, the trial court made extensive findings that the child would be traumatized if he were made to testify at trial." (*Id*. at p. 1268.) The *Gonzales* court held that the seating arrangement was fully justified by the record, as in *Sharp*, and the arrangement "satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of

18

fact.' " (*Ibid.*) In so holding, the court noted that "[o]ther state courts have approved the use of similar seating arrangements, without the findings required by *Craig*." (*Id.* at p. 1267, fn. 17 [collecting cases].)

As an initial matter, we reject defendant's contention, raised for the first time on appeal, that his confrontation clause rights were violated because the trial court failed to make the case-specific factual findings to justify the accommodation (in the form of permitting her to turn in her chair and face the jury) afforded to the victim, as required under *Craig*.

Even assuming this argument was preserved for appellate review, we conclude it fails on the merits. Unlike in *Craig*, this case does not involve the denial of face-to-face confrontation. Situations that do not deny such confrontation do not implicate the type of showing required in *Craig*. (*People v. Lord* (1994) 30 Cal.App.4th 1718, 1722.)[4] Indeed, defendant's argument was effectively rejected in *Sharp* and *Gonzales*. There is no meaningful distinction between the victim's refusal to face defendant or defense counsel here and the conduct that was held not to violate the right to confrontation in *Sharp* and *Gonzales*. There is no right to eye contact with the witness as long as the witness is in defendant's physical presence; thus, it was not necessary for the trial court in this case to make the findings (which the defense did not request) required by *Craig*.

---

[4] This case does not involve an exception to the right of face-to-face confrontation, as in *Craig*. Thus, defendant's reliance on cases *without any* face-to-face confrontation is misplaced. (See, e.g., *Craig, supra*, 497 U.S. at p. 840 [child witness testified outside the defendant's presence via a one-way closed circuit television]; *People v. Arredondo* (2019) 8 Cal.5th 694, 699, 709) [adult witness testified behind a computer monitor]; *People v. Murphy* (2003) 107 Cal.App.4th 1150, 1157-1158 [adult witness testified behind one-way glass]; *Herbert v. Superior Court* (1981) 117 Cal.App.3d 661, 664-665, 671 [courtroom was arranged in a manner that made it physically impossible for defendant and witness to see each other].) We find no merit in defendant's contention that the victim's use of a soft tone and allowing her hair to partially cover her face from time to time amounted to the denial of face-to-face confrontation.

(See *Gonzales, supra*, 54 Cal.4th at p. 1267; *Sharp, supra*, 29 Cal.App.4th at pp. 1781-1782.) Nonetheless, as we have set forth in detail *ante*, the trial court did find that the victim would have been traumatized if she were forced to face directly toward defendant based on its own observations of her and the nature of the alleged crimes. There is ample evidence in the record to support that determination. While the trial court did not hear testimony or take evidence on the victim's emotional trauma prior to her testimony,[5] detailed findings before a witness testifies are not required when, as here, the record shows that the seating arrangement or other accommodation was fully justified. (See *Arredondo, supra,* 8 Cal.5th at p. 709, fn. 4; *Sharp, supra*, 29 Cal.4th at pp. 1783-1784 [explicit findings of emotional trauma unnecessary where it was apparent from record that witness was experiencing considerable distress and was unable to participate effectively in the proceedings when seated in the conventional position in the witness box].) Thus, defendant was not deprived of his confrontation clause rights because the trial court allowed the victim to turn in her chair. This minor interference with defendant's line of sight was fully justified given the need to complete the victim's testimony and her documented distress.

We also reject defendant's contention that he was deprived of his confrontation clause rights because he, defense counsel, and the jury were unable to hear the victim and observe and assess her demeanor on direct examination. As the trial court found, the record reflects that the important principles underlying the confrontation clause were satisfied here. The victim was physically present in the courtroom during her testimony, testified under oath, and was subject to full cross-examination by counsel and observation by the jury throughout. There was no physical barrier or screen blocking the jury,

---

[5] We reject defendant's suggestion that the case-specific factual findings required by *Craig* must be supported by expert opinion. Defendant has not cited, and we have not located, any authority imposing such a requirement.

20

defendant, or defense counsel from viewing and assessing her demeanor. While the record discloses that her testimony was often difficult to hear because she was bent over in her chair and/or looked down or away from the microphone and spoke softly, defense counsel acknowledged that he could follow along with her testimony, the trial court asked the victim to repeat inaudible answers, and no member of the jury indicated they were unable to hear her testimony at any point. As we have described, the record also discloses that the victim, for the most part, turned in her chair and faced toward the jury during her testimony on direct examination, although she often looked down and her hair intermittently covered the side of her face. The trial court found that the victim's hair did not generally cover the front of her face, although there were times when she looked down and portions of the front of her face were obscured by her hair. On this record, we are unpersuaded by defendant's assertion that the victim's conduct while testifying on direct examination interfered with the jury's ability to assess her demeanor and draw its own conclusions about her credibility. The jury could see the victim's general demeanor and reactions to questioning, including her reaction to the questions about the alleged rapes and physical abuse. We see no material distinction between the circumstances of this case and the facts of *Sharp*, which we find persuasive and follow here. Accordingly, because defendant's confrontation rights were not violated, the trial court properly denied defendant's motion for mistrial. In view of our conclusion, we need not and do not address defendant's prejudice argument.

21

# DISPOSITION

The judgment is affirmed.

     /s/
Duarte, J.

We concur:

     /s/
Blease, Acting P. J.

     /s/
Hull, J.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>AMIT BHARTH,<br><br>  Defendant and Appellant. | C090014<br><br>(Super. Ct. No. 17FE014027)<br><br>ORDER GRANTING<br>PUBLICATION |

THE COURT:

Respondent the People of the State of California filed a request for publication with this court. It is hereby ordered:

1. The opinion in the above-entitled matter filed August 18, 2021, was not certified for publication in the Official Reports. For good cause it now appears the opinion should be published in the Official Reports, and it is so ordered.

1

FOR THE COURT:


_____/s/_____
Blease, Acting J.


_____/s/_____
Hull, J.


_____/s/_____
Duarte, J.

EDITORIAL LISTING


APPEAL from a judgment of the Superior Court of Sacramento County, Curtis M. Fiorini, Judge.  Affirmed.

Kevin Dennis Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Christopher J. Rench, Deputy Attorney General, for Plaintiff and Respondent.